John Havelock
LAW OFFICES OF JOHN HAVELOCK
632 Christensen Drive, Suite 100
Anchorage, AK  99501
(907)276-1916
(907)258-9053 (fax)
jehavelock@yahoo.com
Attorney for Defendants

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| HYON N. MORRISSETTE, | ) | AO4-0017 CV (RRB) On Remand |
| | ) | |
| Plaintiff, | ) | **SUPPLEMENTAL TRIAL BRIEF ON** |
| vs. | ) | **CONSIDERATION OF ISSUES** |
| | ) | **RAISED IN PLAINTIFF'S TRIAL** |
| A&W ALASKA INC., et al. | ) | **BRIEF, REQUEST FOR A FINDING** |
| | ) | **ON THE LAW OF THE CASE AND** |
| Defendants. | ) | **FOR BIFURCATION OF TRIAL** |
| | ) | **ISSUES** |

1.    **The court should not let this become a trial about Suzuki's waste of station assets.**

This should be a trial about a very narrow question, whether Mr. Suzuki was unjustly enriched by Shell's forgiveness of his obligations to Shell when he surrendered his franchise in the Mountain View Shell station to Shell.  Damages should be measured by what Mr. Suzuki gained by giving the franchise back to Shell.

2.    **The case for bifurcation.**

Actually, for efficiency and clarity, the trial would be better divided into the two questions:  "Was Mr. Suzuki enriched?" and if he was, "Was that enrichment unjust

under the circumstances?"   If there was no enrichment, then the question of the justice or injustice of the enrichment never arises.

3.    **Unjust enrichment does not encompass common law Waste.**

It is clear from plaintiff's trial brief, that she will not stop with the issue of Mr. Suzuki's enrichment but intends to show that the value of the station is the value ($150,000) that was discussed (without agreement) earlier in late 2002 and during the spring of 2003 on to the time that sale negotiations broke down.  She wants to tell the jury that this is Mr. Suzuki's enrichment.  This is not an argument about what Mr. Suzuki gained (his unjust enrichment), but an argument about values that he wasted.  By taking this approach, (which involves voluminous exhibits) Morrissette is attempting to inject into a case narrowly circumscribed by the Circuit, a claim for common law waste.

All other causes of action were disposed of by this court in its ruling on summary judgment.  Facts relating to these dispositions were established in the court's earlier ruling on summary judgment.  None of these findings were disturbed by the Circuit Court except that the court said that there was "evidence from which a reasonable trier of fact could conclude that the station had value at the time Suzuki surrendered it to Shell."  The Circuit refers to no other point of valuation.  If the station was worth $150,000 at the time it was returned to Shell, it was Shell that reaped that benefit.   All Mr. Suzuki got was the alleged forgiveness of his obligations to Shell.  Reference to $150,000 as a measure of damages is irrelevant and confusing.  It also effectively brings back the dismissed contract claim.  The jury will end up enforcing a contract the court has said is unenforceable.

In support of her argument, in her trial brief, plaintiff Morrissette says, "There is a question as to the status of defendants' counterclaim for reimbursement for money defendants put into the station from August 5, 2003 when they took possession of the station until the time it was turned back to Shell." (Plaintiff's Trial Brief p. 2 "Theories of Recovery.")

There is no such question.   Mr. Suzuki's cause was dismissed.   The plaintiff wants to revive this claim because it is necessary in equity to allow Suzuki to introduce evidence of what he put into the station as a set off against Morrissette's claim that the station franchise was worth $150,000 or more. Her newly framed claim for common law waste must allow the defense that Suzuki put his resources into it.

That is, Morrissette wants to litigate the amount that Suzuki put into the franchise so that she can put in evidence and argue to the jury that the station was worth the $150,000 that she says Suzuki offered her for the station at the time she asked the divorce court to give her the station. Then she will say that this value was maintained or exceeded (by receipts) because Mr. Suzuki's claim for reimbursement is false, as the jury can find- supported by Mr. Suzuki's criminal conviction.   But neither Mr. Suzuki's claim that he is owed for what he put in, nor Ms. Morrissette's counterpart claim that she gave Mr. Suzuki a $150,000 station, that he must have made money on, is an issue in this case.

4.    **The case should be bound by the court's prior findings of fact.**

This court, in its Order on Summary Judgment, also made various findings of fact.  These findings are not subject to challenge on this trial except as they relate to

the Appellate Court's ruling which was stated as follows:  "Morrissette has raised a triable issue of material fact that were Suzuki allowed to retain the value of the station [measured by a release of "his [Mr. Suzuki's] obligations to Shell"] ["at the time he surrendered it to Shell"], he would receive something for nothing."

As this reading indicates, the Circuit Court did not give Morrissette much room for further claims, but upheld this trial court on a broad range of issues and did not dispute the court's fact findings.  Now, Morrissette is trying to expand her claim to make it one for common law waste.  That is, she is asking that the measure of unjust enrichment is not what Suzuki gained at the time he handed the franchise back to Shell, but the difference between her argument for $150,000 value in August (based on price discussions that never came to fruition) when she handed the property over to Suzuki, and the value at the time it was handed over to Shell, zero.  Notice that Morrissette, in her trial brief, makes no mention of disputing the zero value when the station was handed to Shell.  What she wants is the $150,000 that she says was the value when she handed the station over to Suzuki; that is, she is after common law waste, a cause not pled, nor in the case.  This argument should not be allowed, and evidence to support it should not come in.  If the station was worth a million dollars, it makes no difference because that value was taken by Shell, not Suzuki. What Suzuki got was forgiveness of debt to Shell, if anything.  That should be the focus of Morrissette's proof, nothing more.

This court, in its opinion, made findings of the facts in the case.  What follows is this court's findings stripped of the court's discussion.  Suzuki calls this to the

court's attention because it is clear from Morrissette's trial brief that she wants to cover the same territory over again, giving it her spin, ignoring some findings and elaborating on others.  From Suzuki's point of view, this statement of the court's findings contains findings of fact in the case that should not be tampered with.  From Suzuki's point of view, this statement by the court can be read into the record and given to the jury as established court findings.  Apart from Suzuki's concern with Morrissette's tampering with this court's findings, the court's findings will save at least two days of direct testimony and cross-examination.

Here is what this court has already found (taken out are primarily references to the Dimond franchise):

> The history of this case is problematic. It began with a vague and somewhat ambiguous contract between friends, without assistance of legal counsel, for the purchase and sale of the Mountain View Shell, Food Mart, A&W Restaurant (hereinafter the "business"). […] The land and building that housed the business were owned by Shell Oil Co. (hereinafter "Shell"), and a monthly rental rate, or franchise fee, of $14,596.00 was required to be paid by the operator of the business to Shell.

> Almost from the beginning there were problems. Although both Plaintiff and Defendant Terry Suzuki ("Suzuki") were business people, neither envisioned nor provided for the problems that soon developed.

> To begin, Plaintiff's ex-husband, Kyung Rock Kim ("Rocky"), who was listed along with Plaintiff as a purchaser of the business, and who took over management of the business after its purchase in November of 2002, had no experience operating the type of business involved. As a result, the business never became profitable and lost money from the start. Soon Rocky fell behind in his rental payments to Shell.

> Second, the marriage between Plaintiff and Rocky "blew up" soon after Rocky began operating the business. This led to a messy divorce during which the parties seldom communicated about the business. Rocky continued to poorly manage the business while the parties' divorce was

pending, with little or no involvement of Plaintiff. He [Rocky] ultimately managed the business for roughly nine months, between November of 2002 and July of 2003.

The business was awarded to Rocky in the divorce trial, but Plaintiff received a credit in the property distribution of $250,000.00, which was the price she had paid for the business and inventory. This credit was based on the trial judge's conclusion that Rocky had virtually destroyed the business during the time he operated it. Rooky, however, had apparently lost interest in the business by the time of the divorce and made no effort to salvage it.   As a result, the divorce court, at Plaintiff's request, transferred ownership of the business to Plaintiff effective August 1, 2003. When Plaintiff reentered the business, she found the inventory depleted and the business records missing.

Plaintiff by this time was experiencing depression as a result of the divorce.   She still had her own business to run and no longer was interested in operating a gas station. Nevertheless, she wanted to recoup as much of her loses from the business as possible.  Plaintiff, therefore, contacted Suzuki, from whom she and her ex-husband had purchased the business, and who was now residing outside Alaska, and talked to him about managing or buying back the business. Suzuki was reluctant to get involved but indicated in his deposition that we wanted to help Plaintiff if he could. As a result, he agreed to return to Alaska - briefly - to assist in the management of the business.

Significantly, although Plaintiff and her ex-husband had purchased the business, neither she nor her ex-husband ever completed the franchise documents. As a result, as far as the landlord and/or franchiser, Shell, was concerned, the business was still owned by Defendant [Suzuki]. Shell, however, was aware of Plaintiff's involvement with the business and remained willing to work with her, and/or her ex-husband, to complete the franchise documents.

Suzuki resumed operation of the business on August 5, 2003. Suzuki did this on the condition that Plaintiff provide him with money to cover rent and expenses, for he was unwilling to put his own money into the business until he could see that it would become profitable.  Toward this end, Plaintiff gave Suzuki $10,000.00, and the parties began negotiating the terms of a possible buyback of the business.  By this time they were both represented by attorneys.

The parties never reached an agreement with regard to the buyback, and the business never became profitable.   Furthermore, Plaintiff never

completed the franchise documents with Shell, believing that it would not be necessary, given the anticipated buyback.

Once it became clear that a buyback agreement was not going to be reached, Plaintiff sought, in mid September, to retake physical control of the business from Suzuki.  Suzuki, though, was unwilling to permit this unless Plaintiff would provide him assurance that he would be reimbursed for the monies he had invested in his attempt to rebuild the business. Thereafter, in order to avoid incurring any further loss, Suzuki returned the business to Shell. He had been operating it for roughly four and one half months. Suzuki contends that he returned the business to Shell with Plaintiff's agreement. While Plaintiff acknowledges that Suzuki told her of his intention to return the business to Shell unless she paid the rental payments, she denies agreeing to it.

Throughout this entire process, the only written document executed by the parties was the first contract of sale. There was no written agreement for Suzuki to manage the business once he returned to Alaska, There was no agreement regarding monies given to Suzuki by plaintiff to operate the business, and the parties were never able to reach a buyback agreement.

[….]

… T]here is no evidence of fraud on Defendants' behalf with regard to notifying Plaintiff and/or her ex-husband of the need for Shell to approve the sale of the business. Both Plaintiff and her ex-husband knew about this requirement.  In fact, they met with John Scott, the Area marketing Manager for Shell, on at least one occasion to discuss this matter and exchanged e-mails on several other occasions.[1] Moreover, Plaintiff's knowledge of the need to obtain the franchise from Shell was admitted by virtue of Plaintiff's failure to respond to certain requests for admission(s).[2] Furthermore, the need for Shell to approve the franchise agreement was specifically referred to in the initial contract between the parties. … Both she [Morrissette] and her ex-husband were well aware of the need to fill out the requisite franchise papers. They simply choose not to give it high priority. And, there is no evidence to suggest that Suzuki interfered with and/or failed to cooperate with Plaintiff in obtaining the Shell Franchise.

Third, there is no evidence in the contract, or presented elsewhere, to suggest that an accounting was required to be provided to Plaintiff at the time of sale. Part of the problem with this transaction is the fact that

---

[1] Clerk's Docket No. 67, John Scott Aff.
[2] Clerk's Docket No, 35, Ex. 2.

neither party seemed to believe that details needed to be reduced to writing. They were happy accepting one another's word.

…She [Morrissette] no longer wished to engage in this type of business…

…Although the parties both discussed a buyback of the business, they were unable to reach an agreement. Each party had a different understanding of what was going to happen….The Statue of Frauds requires that a contract of this nature be in writing…

…Plaintiff acknowledges inviting Suzuki back into the business and providing him with the keys. She even provided him with money to operate the business. Suzuki was there by invitation and was continuing to make the monthly rental payments to Shell. Plaintiff was unwilling to make any further such payments or to reimburse Suzuki for the monies he had allegedly incurred in operating the business. Suzuki also remained a title holder of the business as far as the landlord, i.e., Shell was concerned. He [Suzuki], therefore, was the one liable for the monthly rental payments; and, from the landlord's perspective, the only one legally entitled to be there.  Having delivered the keys of the business to Suzuki and having failed to take any action with regard to the Shell franchise, and by no longer making rental payments to Shell, Plaintiff appears to have abandoned the business as well as the initial contract between the parties. She cannot now claim that Defendants breached the contract."

Plaintiff did not successfully challenge any of these findings on appeal.

**5.    Voir dire is required to avoid sitting a juror who thinks that "once a crook, always a crook."**

Proposal: The defendant Mr. Suzuki will admit that nine years ago he was convicted of bank fraud. I will advise you that you may consider this fact in determining only the credibility of Mr. Suzuki as a witness.  You may not consider it independently in determining Mr. Suzuki's liability, his propensity to do wrong or the probability of the existence of any fact not a part of Mr. Suzuki's testimony. Do you think you can understand that distinction, and follow my instructions?

**6.    Voir Dire is required to avoid prospective jurors who have had bad experience with franchise agreements.**

<u>Proposal</u>: Have any of you ever owned a franchise or negotiated to acquire one? [If answer is yes] Is there anything about that experience that would make you more or less likely to believe the testimony of a franchisor or franchisee or to find in favor of one or the other in a dispute?

7.  **<u>Some preliminary jury instructions having to do with the rule of the case.</u>**

The following instruction is taken from the court's finding in its order on Summary Judgment.

1.  [The jury should know that this case has been before the court before and that there has already been several rulings regarding claims as follows:]

    A.  There is no evidence that Mr. Suzuki defrauded Ms. Morrissette.[3]

    B.  There is no claim for breach of a contract in this case.[4]

    C.  There no evidence that Mr. Suzuki wrongfully prevented Ms. Morrissette from resuming control of her business after the buyback negotiations failed. [5]

The following instruction is taken from the Circuit Court decision in Morrissette v A&W:

2.  The plaintiff's only claim is that Mr. Suzuki was unjustly enriched as a result of the forgiveness that Shell gave to him at the time he surrendered the franchise. To

---

[3] Order Re Summary Judgment p 7: "Second, the court concludes that there is no evidence of fraud on Defendants' behalf with regard to notifying Plaintiff… of the need for Shell to approve the sale of the business…"

[4] Ibid. p 9 "…although the parties both discussed a buyback of the business, they were unable to reach an agreement….the Statute of Frauds… requires that a contract of this nature be in writing." And Ibid p 10: "Plaintiff appears to have abandoned the business as well as the initial contract between the parties. She cannot now claim that Defendants' breached the contract."

[5] Ibid p. 10. "Plaintiff further contends Suzuki wrongfully prevented her form resuming control of the business after the buyback negotiations failed. Here again, there is a lack of writing and no 'meeting of the minds' with regard to what the parties' intentions were during this time frame…."

find for the plaintiff Morrissette, you must first find that Mr. Suzuki was enriched. If you find that he was not enriched, then you find for Mr. Suzuki.  If you find that he was enriched, then you must determine whether, under all the circumstances, this enrichment was unjust, so that he got "something for nothing."

Dated this 5th day of June, 2007.

  s/John Havelock
LAW OFFICES OF JOHN HAVELOCK
632 Christensen Drive, Suite 100
Anchorage, AK  99501
(907)276-1916
(907)258-9053 (fax)
jehavelock@yahoo.com
Alaska Bar # 6101006
Attorney for Defendants

CERTIFICATE OF SERVICE:  I hereby certify that a copy of the foregoing SUPPLEMENTAL TRIAL BRIEF ON CONSIDERATION OF ISSUES RAISED IN PLAINTIFF'S TRIAL BRIEF, REQUEST FOR A FINDING ON THE LAW OF THE CASE AND FOR BIFURCATION OF TRIAL ISSUES was served electronically this 5th day of June, 2007 on the following:

RONALD OFFRET
raoffret@yahoo.com

By: ____s/John Havelock_____