John Havelock
LAW OFFICES OF JOHN HAVELOCK
632 Christensen Drive, Suite 100
Anchorage, AK  99501
(907)276-1916
(907)258-9053 (fax)
jehavelock@yahoo.com
Attorney for Defendants

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| HYON N. MORRISSETTE, | ) | AO4-0017 CV (RRB) On Remand |
| | ) | |
|     Plaintiff, | ) | **REPLY OF THE DEFENDANTS TO** |
| vs. | ) | **PLAINTIFF MORRISSETTE'S** |
| | ) | **OPPOSITION TO MOTION FOR** |
| A&W ALASKA INC., et al. | ) | **JUDGMENT ON DIRECTED** |
| | ) | **VERDICT; FOR JUDGMENT N.O.V** |
|     Defendants. | ) | **OR IN THE ALTERNATIVE FOR A** |
| | ) | **NEW TRIAL** |

**1.   In Calculating Damages, the Jury failed to follow the basis for damages set out by the Ninth Circuit.**

      For his Reply Mr. Suzuki begins, as does Ms. Morrissette's Opposition, with the Decision of the Ninth Circuit.  In her Opposition (Argument 3 (a)), she addresses the issue of damages quoting from the Circuit Court Decision.  Here is what that court said about the factual issue to be tried below:

> Morrissette submitted a sworn affidavit stating that she returned possession of the station to Suzuki only after Suzuki promised to buy the station.  When Suzuki decided not to buy the station, he did not give possession of the station back to Morrissette, but instead surrendered the station to Shell in exchange for a release of his obligations to Shell.  There is also evidence from which a reasonable trier of fact could conclude that the station had value at the time Suzuki surrendered it to Shell.

MORRISSETTE V. A&W, et al.            Page 1 OF 13        REPLY … OPP TO MO FOR JUDGMENT
CASE NO. A04-0017 CV (RRB)                                       ON DIRECTED VERDICT; FOR
                                                                                          JUDGMENT N.O.V OR IN THE
                                                                                         ALTERNATIVE FOR A NEW TRIAL

> *Morrissette has raised a triable issue of material fact that were Suzuki allowed to retain the value of the station, he would receive "something for nothing."* (italics added).

The cause of action in equity is the italicized part, the "doctrine of unjust enrichment." The plaintiff must prove that Mr. Suzuki received something for nothing. From the perspective of the Ninth Circuit, the something he got for nothing was "the release of his obligations to Shell" (if that had a value to him - a factual question for the trail court). The Circuit court's presumption is that the quid pro quo was "the value [of the station] at the time of its surrender to Shell" given "in exchange for a release of his obligations to Shell."

The measure of the value Mr. Suzuki received, the "something", was the "release of his obligation to Shell." Issues of "injustice" aside, that is the measure of damages. For example, if the station was worth a million dollars, the only part of the value that was unjust enrichment to Mr. Suzuki was the value of the release of obligations to Shell, the rest being windfall to Shell. The crucial issue on damages was *what was the value to Mr. Suzuki of the release*?

It would also be true that the value of the station at the time of surrender would put a lid on the unjust enrichment. Mr. Suzuki could not be more enriched than the value of the station at the time it was surrendered. A plaintiff does not get restitution in a greater amount than her loss. That is why the Circuit Court said that a jury could find that the station had some value at the time of its return. If it had no value, then there could be no recovery.

Ms. Morrissette testified to the value of the station at times after it was run down through mismanagement. Ms. Morrissette testified that she put the value at $150,000 (Trans Morrissette at 122, 138.) She said in December that she was ready to pay the December rent if Mr. Suzuki would agree to buy the station for $150,000, so her last evaluation was $135,404 (except for the zero evaluation she urged on the divorce court before the franchise was surrendered. See discussion *infra*.)

Ms. Morrissette's case was presented through her own testimony, the testimony of David Cho (her nephew), and of the defendant Mr. Suzuki. Nothing in Ms. Morrissette's testimony related to the primary issue of the enrichment of Mr. Suzuki. Nothing in Mr. Cho's testimony related to this issue. Mr. Suzuki testified to the contents of the franchise lease which called for the payment of $14,596 per month and he agreed that at the time of the surrender there were 15 months to go. He was not asked whether, as a practical matter, he owed that money to Shell. The only testimony regarding the consequences regarding rent was delivered in the course of the Defendant's case by Mr. Scott. There was some testimony from Mr. Suzuki that he had tried unsuccessfully to get the rent reduced to $8,000 a month, the point being that the station might have been able to be profitably run at $8,000 a month. If he had run the station at a loss, if one considers the 15 month obligation hard and fast, his debt to Shell could have been reduced to 14,596 – 8,000 x 15 or $98,940. As it was, Shell re-let the franchise after a short closure, and Mr. Suzuki had no obligation.

If Mr. Suzuki's recitation of the terms of the lease document, during Ms. Morrissette's case, was alone sufficient to establish an enrichment to him, that

proposition was destroyed by the testimony of Mr. John Scott, a long-time Shell employee, retired at the time of trial, as to the effect of that document in a failed franchise situation.  Mr. Scott testified that in 34 years he had never seen Shell go after a failed franchisee for the tail end rent due, only for products not paid for. (Transc. Scott p. 451).  He testified that the station had been taken over by a new operator after it was closed, which would have been counted as a set off in the event that Shell actually had pursued the tail end rent. In accordance with Shell practice, Mr. Suzuki signed a standard termination agreement, which was introduced in evidence, based on mutual releases and which made no reference to forgiveness of rents or the value thereof but, specifically, only to preserving Shell's rights to come after Mr. Suzuki for Shell property held by Suzuki.  This document, combined with Mr. Scott's testimony, negates any inference that Mr. Suzuki profited from the return of the lease.

But Ms. Morrissette was not asking for a loss measured by unjust enrichment.  Her effort was to bypass unjust enrichment and focus on restitution, a remedy also applicable to contracts and to measure her loss by the joint loss of investment by her and her husband from the day of purchase.  That is, she wanted the original purchase price refunded to her notwithstanding the damage done to the franchise through her management.  As Mr. Offret told the court, after objections were made to the use he was making of the original purchase price in his direct examination of Mr. Suzuki, "Well, I think it [the original purchase price] goes to unjust enrichment. (indiscernible) charges her six or seven months later, charges her $241,000 for it, and then turns around and surrenders it without even giving her any chance.  I think that has

to do with unjust enrichment." (Trans. 252). Likewise in his closing argument, Mr. Offret focused on the value of the station at the time it was originally sold (Trans 478- 81) as being the loss to Ms. Morrissette. The court had tried to negate that line of argument by instructing the jury that the price was for background information only, but the jury came in with the original price as the damages anyway, a clear sign of confusion among jurors.

Unfortunately for Ms. Morrissette, the trial court had already ruled that there was no contract and no fraud. The Circuit Court made it plain that the original sales price was out of the case. It was just, was Mr. Suzuki enriched by his possession from August 5 on to the end of the year - a value that he traded for forgiveness of debts to Shell, that is, matters relating to the original sale were out of the case. That Mr. Suzuki may have made a sharp or even overreaching contract at the time of sale was irrelevant on remand from the Circuit. All that was left was unjust enrichment on the factual basis stated by the Circuit Court. This Ms. Morrissette failed to establish by credible evidence.

**2.   The effect of the fraud conviction and the misleading argument of counsel was to lead the jury to a verdict unsupported by the facts.**

Ms. Morrissette disputes this argument of Mr. Suzuki in Paragraphs 1 and 3 of her Opposition. This case is unusual in that the facts which were before the trial judge on the Motion for Summary Judgment did not substantially change afterwards. Mr. Suzuki's credibility was not actually much of an issue since, on the relevant matters, there was little departure from Ms. Morrissette's account of their dealings.

The Circuit Court said that there was evidence (by affidavit) that Ms. Morrissette gave the station to Mr. Suzuki in August of 2003 because Mr. Suzuki promised he would buy the station. This issue is covered in Ms. Morrissette's evidence at trial at page 114-116 of the transcript.

Ms Morrissette states that she did not want to take the station back in the divorce. She was going to receive its value in the divorce, and she was not looking for a headache in trying to revive it. When asked whether she had gone to the divorce court to get it back, she said,

> "I don't want to do it but he [Suzuki] says he going to jumping into it, and he... asking me (indiscernible) then.
>
> Q: O.K.,
>
> A: He say he going to buy it back.
>
> Q: And so you went to the divorce court and got the court to give you possession of the station?
>
> A: Yes. …
>
> Q: How much?
>
> A: Was we get—discuss was $150,000 as it is, because Rocky—he say he don't know how much Rocky didn't pay the bill until the open book come, so we agree to as it is, 150,000."

What went on here is that Mr. Suzuki was suggesting that she take control of the station and give it back to him to manage, and he would give $75,000 each to her and to Rocky. Though this deal was never consummated, this was some evidence of what Mr. Suzuki thought before he reentered the station in August. After trying to operate it, he

began to realize that the station was not salvageable, so that by December he was ready to throw in the towel at no return to him.

It is important to note that Ms. Morrissette got the station back for nothing. That is, she so testified on cross-examination (trans p. 191):

> Q: And isn't it true that Rocky is – was held totally responsible for the decrease in the value of the asset, the $250,000, and as a result, that in the split of the marital estate, you got the benefit of the $250,000?
>
> A: Yes.

Since in the divorce action, on appeal to the Supreme Court, Ms. Morrissette was claiming, successfully, that the value of the station was nothing at the time of the divorce, that is, in the spring of 2003[1], and that the diminishment in value was caused by

---

[1] This claim of zero value was made by Ms. Morrissette early in the divorce proceeding. At 189 of the transcript, when asked, "Well, didn't you – you had a divorce proceeding in which you told the court that, [that the value was zero], didn't you? Ms. Morrissette appears to have been confused because she answered, "Yes, because at the time when we filed the divorce, get a decision, the station was already surrendered, so the value is zero, yes."

But as the record in the first phase of this case indicates (and Transcript 113 in this trial for example), she filed the divorce while she and Rocky were in possession of the station in early 2003. When she went back to the divorce court to get possession of the station, the value of the station was surely already argued by her counsel at zero. In fact, her claim in divorce was not that the value of the franchise was zero because it was surrendered at that value, but that it was that value because of the misconduct of her husband. According to the opinion Morrissette v Kim, published at 2006 WL 3334056, the parties held a settlement conference before the court in December of 2003, so that the position that the station was valued at zero was contemplated in Ms. Morrissette's decision (always with legal advice) at the time she was contemplating Mr. Suzuki's offer to her to give her the station if she applied to Shell for it and paid the December rent. At that time, it would have been a big mistake for her to take the station back because of its negative effect on her recovery from her husband. She had good legal advice at the time. No wonder she would not touch it. Even if the final decree in her divorce was not entered until after Mr. Suzuki had surrendered the station, she still

her husband's mismanagement, she is collaterally estopped from claiming at the time of this trial that the station had value at the time it was surrendered to Mr. Suzuki, in this litigation. *Rockstad v Erikson*, 113 P.3d 1215 (Alaska 2005). At the time this case was tried, it was a matter of record in the Alaska Supreme Court, on her plea, that the station had no value. If for some reason, collateral estoppel does not apply as a technical doctrine, this is still powerful sworn testimony on her part corroborating her admission that Rocky had reduced the value to zero. A court of equity cannot ignore the unjust enrichment that Ms. Morrissette will obtain if she gets the value of the station from both her husband and from Mr. Suzuki, a clear double recovery.

Given the undisputed evidence that Ms Morrissette was not deprived of any value, the only explanations of the jury's verdict are first, that Ms. Morrissette's counsel argued that she should get the entire, original, 2002 joint investment back, a claim of restitution based on contract or fraud, and because Mr. Suzuki was a dishonest (per bank fraud) person. As the court knows, judges can instruct, but the jury may forget or otherwise fail to follow the court's instructions.

### 3. **Mr. Suzuki's assertion that he lost money on the only relevant transaction is supported by the only evidence available.**

This issue, disputed in Plaintiff's Opposition in paragraph 3(b), is relevant because it is essential for the plaintiff to prove that Mr. Suzuki profited from his tenure as station manager after August 2003 if he was unjustly enriched. In her Opposition,

---

got that value by claiming it had no value as a result of Rocky running it, so a double dip for her is a given if she is sustained in this case.

Ms. Morrissette is relying entirely on the testimony of the joint accountant, Mr. Han Choe.[2] Unless Mr. Choe produced evidence that Mr. Suzuki was enriched through his management of the franchise, on the motion for a directed verdict, he is entitled to judgment.

The examination of Mr. Choe (Trans. 348 on) related to Mr. Choe not knowing what the background information might be to support various expenses and income items in the report prepared by him for Mr. Suzuki's taxes and for any accounting with Ms. Morrissette if a settlement was to come.  The figures referred to were consistent with Mr. Herman's later testimony as to how he had to juggle accounts, borrowing and paying back other stations owned by Mr. Suzuki, to cover expenses. The accounts reflected a cash shortage of $62,845. (Trans 361). Ms. Morrissette's main point in questioning Mr. Choe was to establish that an unclassified expense was actually not an expense, and that if that were the case, it could be used to reduce the cash shortage.  But Mr. Choe testified that an unclassified expense was not necessarily improper (Trans 366).  He also testified that he was getting this information from Mr. Suzuki's employees and giving it to Mr. Suzuki. He confirmed the practice of transferring funds between stations to cover shortages. (Trans 368).  In a classic case of not asking a question to which you don't know the answer, Ms. Morrissette's attorney asked Mr. Choe:

---

[2] In her Opposition Ms. Morrissette refers to "Mr. Cho." Mr. Cho was her nephew. The accountant called by Mr. Suzuki was "Mr. Choe."  Mr. Suzuki responds to the Opposition as if she meant Mr. Choe.  Mr. Cho had no information on this subject.

> Q: And you can't tell from this report whether or not Mr. Suzuki made any contribution to Mountain View Shell, can you?
>
> A: On this state -- if they were – they --- yeah, in a way, yes, because the – it – the gas station was operating with a negative cash flow, and if there wasn't any addition cash infusion, the bank account would be negative. And so – so the – I -- I assume that the -- the – any shortage was covered by the – Mr. Suzuki.

Thus, considered as a question for the directed verdict that was moved at the close of the plaintiff's case, nothing that any of the other witnesses said showed that Mr. Choe was not correct. The plaintiff had to show that Mr. Suzuki had profited from the operations of the franchise after his repossession, and no such evidence was forthcoming. All he showed was that Mr. Suzuki had not gone through the expense of an audit in preparation for his defense.

Considered also as an issue for N.O.V., the testimony of Mr. Suzuki's witness, Mr. Herman, is examined as well as that of Mr. Choe, the only plaintiff's witnesses on this issue. Mr. Suzuki was managing the station indirectly from Seattle and all transactions were being run by Mr. Herman. Mr. Herman came back to the station on the following direction: "He [Suzuki] basically just said to get it back in order, it's kind of a mess and just try to, you know, get it back to where it was supposed to be." (Transcript 436-7)

> Q: Were you handling the finances of the station at that time?
>
> A: I would count the money and make deposits.
>
> Q: And how about expenses and inventory purchases?
>
> A: Yes, I did all that, too, yeah.
>
> ……………………

> Q: Did the – did you have to take transfers of money from the other stores in order to make ends meet from time to time?
>
> A: Yeah, yeah.
>
> Q: And then would you pay them back?
>
> A: Yeah, whenever we had it back. Yeah. We – I think we were doing it between three stores, I think. …
>
> …………………..
>
> Q: And when you saw you needed cash, you'd ask for money from Terry, to provide money from some other account?
>
> A: Yeah, yeah.
>
> Q: And did that happen?
>
> A: Especially- especially around rent time.
>
> ……………………
>
> Q: Did Terry ever ask you to write a check to him personally for payment on his car or anything like that?
>
> A: No. He – I had to write it to him a couple times, I – I remember because he took money out of his personal account.

So here is the person who is actually in charge of the accounts of the store, and he testifies that to make the business stay open, Mr. Suzuki had to take money from his personal account. The only testimony in the whole case on the issue of profitability supports Mr. Suzuki's position.

### 4. The value of the station was impaired through the mismanagement of Ms. Morrissette's husband.

This issue disputed in Plaintiff's Opposition in paragraph 3(b) is relevant in that if the value of the franchise was diminished through the conduct of Ms. Morrissette

or her husband, then she cannot claim the value of that diminishment as unjust enrichment to Mr. Suzuki. This Opposition argument has been dealt with *supra* in response to Part 2 and earlier parts of the Reply.

**5.   There is both a factual and a legal basis for granting a new trial.**

This issue is disputed in Plaintiff's Opposition in paragraph 4. First, Mr. Suzuki believes that a directed verdict in favor of defendant and/or a judgment N.O.V. is the justifiable outcome of this case. With respect to a new trial, Ms. Morrissette has correctly stated that the court need not view the evidence from the perspective most favorable to the prevailing party. In the opening paragraphs of her Opposition, she has set out the standards for granting a new trial. Where the plea under consideration (unjust enrichment) is in equity, normally the court's domain, hesitancy in rejecting jury determinations from the spin given by counsel to facts is less of a compelling guideline.

**6.   Conclusion.**

Plaintiff's Opposition has not identified facts that alter the views expressed in the defendants' original motion for Summary Judgment. The trial of the case on remand has not substantially changed the factual alignments that informed the court's understanding of the case at the time the court granted summary judgment. The Circuit Court asked this court to take a look at unjust enrichment. If anything, the injustice of granting the relief urged by the plaintiff is even plainer. Where is the enrichment? Where is the injustice to Ms. Morrissette in the outcome? The court should grant defendant's motions for directed verdict and for judgment N.O.V. Though the jury was clearly misled and confused, almost no facts were in dispute any more than they were

at the time of the court's earlier consideration. The plaintiff's case was all about the spin that could be given these facts. When alternative versions of facts came up in the trial, it does not appear that the selection of one fact over another, would affect the outcome. Defendant urges a new trial only if the court does not find cause for a directed verdict or judgment N.O.V. as appears compelled by the evidence.

   Dated this 12th day of July, 2007.

               s/John Havelock
               LAW OFFICES OF JOHN HAVELOCK
               632 Christensen Drive, Suite 100
               Anchorage, AK  99501
               (907)276-1916
               (907)258-9053 (fax)
               jehavelock@yahoo.com
               Alaska Bar # 6101006
               Attorney for Defendants

CERTIFICATE OF SERVICE: I hereby certify that a copy of the foregoing REPLY OF THE DEFENDANTS TO PLAINTIFF MORRISSETTE'S OPPOSITION TO MOTION FOR JUDGMENT ON DIRECTED VERDICT; FOR JUDGMENT N.O.V OR IN THE ALTERNATIVE FOR A NEW TRIAL was served electronically this 12th day of July, 2007 on the following:

RONALD OFFRET
raoffret@yahoo.com

By: s/John Havelock

MORRISSETTE V. A&W, et al.    Page 13 OF 13    REPLY … OPP TO MO FOR JUDGMENT
CASE NO. A04-0017 CV (RRB)             ON DIRECTED VERDICT; FOR
                                   JUDGMENT N.O.V OR IN THE
                                ALTERNATIVE FOR A NEW TRIAL